FRANCIS WARNER, Plaintiff in Error, *v.* ROWLAND CARLTON, Defendant in Error.

ERROR TO LASALLE.

A vendor of goods with a warranty, is a competent witness, in an action between his vendee and a judgment creditor.

Where a bill of exceptions does not state that it contains all the evidence, the presumption is in favor of the verdict.

Where a vendee employs his vendor as a clerk to sell goods, although the fact may excite suspicion, it is not *per se* fraudulent, and may be explained.

THIS was a suit commenced in the Circuit Court of LaSalle county, at the February term, A. D. 1859, by a writ of replevin. The articles replevied, were merchandize in a store.

The coroner of LaSalle county, to whom the writ was directed, returned the same with the indorsement following, to wit:

ROWLAND CARLTON,
    *vs.*    }  *Writ of Replevin.*
FRANCIS WARNER.

Executed this writ by reading to defendant, Francis Warner,

and delivering the within described goods and chattels to David L. Hough, attorney for plaintiff.

ROBERT M. McARTHUR, *Coroner.*

There are no damages alleged or asked for in the præcipe, affidavit or writ. The declaration was filed on the 18th January, A. D. 1859, and is in the words and figures following, to wit:

STATE OF ILLINOIS, ⎱ LaSalle County Circuit Court.
LASALLE COUNTY. ⎰ February Term, A. D. 1859.

Rowland Carlton, plaintiff in the suit, by Greenwood & Hough, his attorneys, complains of Francis Warner, sheriff of said county, defendant in this suit in a plea of replevin, for that whereas he unlawfully took and unjustly detains the goods and chattels of the said plaintiff, for that the said defendant heretofore, to wit, on the 15th day of January, A. D. 1859, to wit, at the county aforesaid, unlawfully took and unjustly detained from the said plaintiff, four barrels of C. powdered sugar, three barrels B. fine yellow sugar, five boxes family soap, eight boxes chemical soap, seven boxes starch, four boxes candles, three boxes saleratus, two half chests tea, fourteen boxes tobacco, twenty-three boxes tobacco, three boxes ginger wine, one keg prunes, five boxes cream tartar, four boxes ground allspice, two boxes pimento, one box pepper, two boxes pepper sauce, three boxes tomato catsup, one box pickles, one box chocolate, one box citron, eight boxes herrings, two and one-half dozen wooden pails, four hundred and ninety pounds cheese, one dozen half-bushel measures, twenty reams of wrapping paper, ten reams of wrapping paper, one barrel lard oil, four barrels vinegar, one barrel spirit gas, one barrel rye whiskey, two barrels sugar, six half-barrels mackerel, three half-barrels white fish, two boxes codfish, one and one-half barrels napes and fins, sixteen kits mackerel, sixty boxes cigars, twenty-one boxes cigars, fifteen boxes cigars, sixty-two bottles brandy, one cask gin, twenty gallons brandy, one cask port wine, one part barrel Bourbon whisky, one keg Jamaica rum, one cream colored horse, one wagon, one harness, one fire proof safe.

Which said goods and chattels were then and there the property of said plaintiff, and of great value, to wit, of the value of fifteen hundred dollars, and from thence, hitherto, the said defendant hath unlawfully and unjustly detained the said goods and chattels from the said plaintiff, and still detains the same against gages and pledges, to the damage of said plaintiff, in the sum of three thousand dollars, and therefore he brings this suit.

The defendant filed four several pleas:

1st. Non detinet.
2nd. Property in R. H. Carlton.
3rd. Property in defendant.

4th. That he was sheriff of LaSalle county, and as such, he took the property by virtue of three executions in his hands, as such sheriff, against R. H. Carlton, and that the property belonged to R. H. Carlton.

The defendant filed replications traversing each of said pleas.

The trial resulted in a verdict in favor of the plaintiff below, and an assessment of one cent damages against the defendant.

There was then a motion for a new trial, which was overruled by the court. Also a motion in arrest of judgment, which was also overruled by the court, HOLLISTER, Judge, presiding.

The plaintiff, to maintain the issue on his part, called *Volney G. Hatch*, who testified in substance as follows:

I am acquainted with Rowland Carlton; he resides in Sedgwick, Maine; he has been making investments in this county in real estate; have known R. H. Carlton about three years; have been in partnership with him in LaSalle; we went into partnership two years ago last June; remained in partnership about eighteen months; he put in $1,600; that money was furnished him by his father, the plaintiff; I sold out my interest in the business to R. H. Carlton; he paid me for my interest and assumed the liabilities of the firm; the liabilities were about $4,000; between $2,400 and $2,600 was a debt due the plaintiff for money furnished Hatch & Carlton; Rowland Carlton held Hatch & Carlton's notes for that amount; when I sold out to R. H. Carlton, R. Carlton took up Hatch & Carlton's notes, and R. H. Carlton gave R. Carlton his notes for that amount; a portion of the debts secured by R. Carlton were due to Chicago parties, and R. Carlton and R. H. Carlton gave joint notes for those debts; I sold out to R. H. Carlton about the 6th February, A. D. 1858; R. H. Carlton carried on business at the same stand after I sold out to him; the business was grocery and provision store; the plaintiff was not there when I sold out to R. H. Carlton, but R. H. Carlton sent on his notes for what Hatch & Carlton owed the plaintiff, and Hatch & Carlton's notes came back canceled; there was a sale of said grocery store by R. H. Carlton to the plaintiff; the sign was changed.

The sale took place in LaSalle; don't know anything about the terms of the sale; don't know positively that R. H. Carlton owed the plaintiff anything at that time; plaintiff owns considerable real estate about LaSalle; the general reputation is that he is a man of considerable property; the plaintiff said he would advance the $1,600 for the purpose of setting up R. H. Carlton in business with me; the plaintiff came into our store one morning and said he had bought out R. H. Carlton, meaning R. H. Carlton, his son; that he would attend to the business himself, and see if he could not get matters into better

shape; this was after the sale; R. H. Carlton had his, name painted on each window, as grocer; on top of the awning he had a board with his name; this sale was made in the fore part of October last; the first time I noticed the sign on the awning was changed, was within two weeks; don't know when it was changed; it now reads R. Carlton; there is another sign suspended over the sidewalk under the awning; don't know when it was placed there; I think within from four to five weeks; it reads Carlton's; don't know who put it up; it is most conspicuous to those on the sidewalk; most of the people that trade at the store pass on the sidewalk; the signs on the windows are taken off entirely; I don't know whether the plaintiff went in and conducted the business or not; he has not been in LaSalle since he bought out; he resides in the State of Maine.

I saw a notice of the sale in the newspaper, in the "LaSalle Press," on the 16th day of October, A. D. 1858.

Plaintiff then introduced the said *R. H. Carlton* as a witness; to the competency of which said witness, on the ground of interest, the defendant, by his attorney, then and there objected. The court overruled the objection, and defendant excepted.

The said witness gave in substance the testimony following:

I am the son of R. Carlton; I was indebted to R. Carlton $1,600 at the time I went into business with Hatch; Hatch & Carlton were indebted to R. Carlton, at the time I bought Hatch out, $2,400, and he, R. Carlton, was security for about $1,800, which was on notes; R. Carlton signed notes with me for about $1,800; in last October, at the time of sale, there was an inventory of amount of stock, notes and accounts; this indebtedness was released; security was entered into; possession was given of store and books, and all that belonged to the store; R. Carlton employed two clerks and discharged two; he thought there was too much help; the very day the sale was made, the sign in front of the awning was taken down, and the next day the painter made it R. Carlton; R. Carlton was here at the time of the sale, and staid three weeks; sale took place about October 6th, 1858; the sign across the sidewalk, which reads Carlton's, has been up three weeks or more; he loaned me money to go into business; he loaned me money to invest in property, and I invested it; he took back the property and let me have the money; it was sold back to Rowland Carlton; he loaned me in the first place $300, and subsequently enough to make $2,100 or $2,200; I drew on him for first money.

I have been in the store ever since the sale to R. Carlton, and have taken charge of matters as formerly, only that I acted as agent for my father; I kept one key to the safe and Telfer kept one; took charge of business same as others in the store; have

not taken quite as much charge of business since as before; most of the goods since that time have been bought in LaSalle; Telfer often made purchases without letting me know; he never assumed to act in the store in opposition to my expressed wishes; father did not give Telfer a power of attorney, but he did give me a power of attorney to transact his business; he gave a written order to Cruickshanks to honor Telfer's checks.

R. Carlton employed and paid me; some of the goods taken, quite a large portion that were taken, were purchased by my father after the sale.

Could not state what the articles were that were taken that were purchased after the sale to R. Carlton—some sugar and other articles that I cannot enumerate; R. Carlton has not personally bought any of the goods after the sale; has not been notified of the purchases; I have not advised him of the profits or losses of the concern; I have been paid seventy-five dollars per month since the sale.

*George M. Cook* was then called by the plaintiff, who testified: I was employed in the store by Carlton; was there at the time of the sale to R. Carlton; helped to take an account of stock; book contains a correct account of the amount of stock; could not state that all the articles are correct; I called off correctly; Telfer did the writing; was one of the clerks; R. Carlton kept no bill after inventory; told me he should want me to stay there until after the inventory, and should want me no longer; the store was open as much as usual while we were inventorying.

There was nothing more there to indicate a sale except taking account of stock; don't know that there was anything more than my being out of the store, that would indicate a change; saw nothing different after sale from what it was before; to all appearance, things were same after as before the sale; signs in window were changed from R. H. Carlton to R. Carlton, by scratching out the H.; part of name in one window prior to sale was broken out by the glass getting broken; part of the time R. Carlton was around with me while I was calling, and a part of the time he was not in the store at all; don't know when the signs were changed; one of the window signs was changed by me, and the other by some one else; part of the paint was left on the glass after the H. was scratched.

The plaintiff then introduced *G. W. Telfer*, who testified as follows:

I was clerk for R. H. Carlton at time of sale; took account of stock correctly as called by Cook; have been since employed by R. Carlton; R. H. Carlton has been there since the sale, and in his absence I took charge of the store; I was there at the

time of the levy by the sheriff; some of the goods that were purchased since the sale were taken by the sheriff; R. Carlton invested at one time since the sale, $900, and at another time $400; on the 6th of October, new books were opened in name of R. Carlton; receipts, bank account, etc., were kept in name of R. Carlton; have told customers, and so has R. H. Carlton, that the goods had been sold to R. Carlton; the signs on the windows were R. H. Carlton, Grocer; the H. was scratched out; the sign under the awning was changed to R. Carlton; it formerly being down under the awning, but was subsequently put on top; R. Carlton took charge of the business and continued it while he remained; I never had any direct or different authority from R. Carlton to purchase goods.

I never went to Chicago to purchase goods when R. H. Carlton was there, without his advice; both I and R. H. Carlton kept key to safe; the assignment of the notes and book accounts was made in my presence; the books were all posted up at that time except our account; there was an actual delivery of book by R. H. Carlton to R. Carlton; they delivered a book in the name of all the accounts; there was money paid at time of sale to R. H. Carlton; R. Carlton did not figure up amount of books at any time; at the time we took account of stock he was with me all the time; the difference between the accounts, notes and stock and amount of indebtedness of R. H. Carlton to R. Carlton, not paid, was about $50; amount of indebtedness of R. H. Carlton to creditors, not paid, about $3,000; the accounts due R. H. Carlton's creditors were in the same books turned over to R. Carlton; the bill book, if properly kept up, would show amount of R. H. Carlton's indebtedness; I think R. Carlton had the means of knowing the amount of R. H. Carlton's indebtedness; there were notes transferred, not by actual indorsement on the back, but on another piece of paper; R. H. Carlton got money whenever he wanted it; he did not take out $70 per month; I kept cash book until sale; some of the notes that were transferred have been paid to R. H. Carlton; there has been no remittances made to R. Carlton, who lives East, as far as I know; R. H. Carlton corresponds with R. Carlton; I know how books have been kept; there never was any balance sheet of old books; any stranger glancing through the books might ascertain amount of R. H. Carlton's indebtedness.

The plaintiff's instructions were given by the court to the jury, as follows:

1st. If the property was in possession of the plaintiff by his agent or agents, claiming to be the owner thereof at the time it was taken on the execution mentioned in the plea, and

the same was taken by the defendant, the jury should find for the plaintiff, unless it is shown by the proof that the plaintiff did not own the property, or that the sale thereof from R. H. Carlton to the plaintiff was made with the view, on the part of both R. H. Carlton and the plaintiff, of hindering, delaying or defrauding the creditors of R. H. Carlton.

2nd. Fraud cannot be presumed, but must be proven ; and the jury are not at liberty to infer that the sale from R. H. Carlton to plaintiff (if such sale was made) was fraudulent, but the same must be proved to the satisfaction of the jury before they can find the property to be the property of R. H. Carlton.

3rd. A sale of property for a valuable consideration, when there is a delivery of the property sold, passes the title to the purchaser, and the fact that the seller was in debt will not, of itself, invalidate the sale, although the purchaser may have known that fact at the time of the purchase.

4th. If R. H. Carlton was indebted to the plaintiff, and the plaintiff assumed and agreed to pay debts due from R. H. Carlton to third persons, these constitute a good consideration for the sale (if proven) from R. H. Carlton to plaintiff.

5th. If there was a delivery of the property sold to the plaintiff by R. H. Carlton, that was all that was necessary to vest the title in the plaintiff, (if there was a sale on a good consideration,) and the fact that the plaintiff afterwards employed R. H. Carlton to assist in carrying on the business, and left him in connection with others in charge of the property, as plaintiff's agent, would not invalidate the sale.

6th. Although a delivery of property sold, is necessary to pass the title thereto, yet such delivery need not be an actual manual delivery ; but anything which clearly shows a surrender of ownership by the seller, and an assumption of ownership by the purchaser, accompanied by such circumstances as would reasonably advise the world of such change of ownership, is all that is necessary on that point.

7th. Even if the jury should believe, from the evidence, that the object and purpose of R. H. Carlton in making the sale, was to hinder, delay or defraud his creditors, yet unless the jury are satisfied, by the proof, that R. Carlton, the plaintiff, knew that fact, and bought the goods with such knowledge, the jury cannot find that the sale was fraudulent for that reason.

8th. A party may be in possession of property by his agent as well as by himself, and if the goods were sold for a valuable consideration, and the possession delivered to the purchaser, it is not necessary that he should remain in the actual possession of the property sold, to guard his title ; but such possession may be by an agent or agents, and such agent may be the seller of

the property, if such possession is such as to advise creditors of the change in the title of the property.

The defendant then and there asked the court to instruct the jury in his behalf as follows :

If the jury believe, from the evidence, that the sale alleged to have taken place on or about the 8th day of October, A. D. 1858, was made by Rowland H. Carlton with the intention of preventing his creditors from collecting their demands against him, and if they further believe that plaintiff had notice of such intention on the part of the said Rowland H. Carlton, or was so situated that he might have known it, then the sale was void as to Rowland H. Carlton's creditors, although a valuable and adequate consideration, may have been paid by the plaintiff for the goods in question, and the jury should find for the defendant.

If the jury believe, from the evidence, that the sale in question was made by Rowland H. Carlton with the intent to hinder, delay or defraud his creditors, and that such intent was at the time of said alleged sale known to the plaintiff in the suit, then the sale would not be legal, as against the creditors of the said Rowland H. Carlton, and the jury should find for the defendant. And for the purpose of deciding upon this question, the jury may consider the means of knowledge possessed by the plaintiff, at the time of the alleged sale, of R. H. Carlton's business affairs, and the relationship existing between the parties.

The court qualified the said defendant's 1st and 2nd instructions, as follows :

The first by the insertion of the words following, to wit: " Yet if the jury believe, from the evidence, that Rowland H. Carlton was indebted to the plaintiff, and that the sale, if any was made, by R. H. Carlton to plaintiff, was with the *bona fide* intention to pay such indebtedness, it is valid, even against other creditors of R. H. Carlton."

And to the 2nd instruction, by the insertion of the following words, to wit : " Yet if said sale was made to pay a *bona fide* indebtedness to plaintiff, it is a valid sale, if not made to defraud, hinder or delay other creditors."

D. P. JENKINS, for Plaintiff in Error.

W. H. L. WALLACE, and D. L. HOUGH, for Defendant in Error.

WALKER, J. The first question presented by this record, for our consideration, and which was urged with most earnestness, is whether R. H. Carlton was a competent witness on the trial

below. It is a rule of uniform application that a person not a party to the record, and whose interest is equally balanced, is competent. *Stokes* v. *Kane*, 4 Scam. R. 167. This witness was the vendor of the goods in controversy, and it is urged that his interest is not balanced between his execution creditor and his vendee. In numerous cases of this character it has been held that his interest is balanced, and that he is competent. *Bailey* v. *Foster*, 9 Pick. 139; *Prince* v. *Shepherd*, ib. 176; *Ragland* v. *Wickware*, 4 J. J. Marsh. 530; *Lumpton* v. *Lumpton's Ex'rs*, 6 Mon. 116; *Rice* v. *Austin*, 17 Mass. 197; *Martin* v. *Jackson*, 1 Carr. and Paine, 17. There are, however, cases which seem to militate against this doctrine, but the weight is, we think, most clearly in its favor.

This rule has been recognized by former adjudications of this court. In the case of *Clifton* v. *Bogardus*, 1 Scam. R. 32, where an execution in favor of Bogardus and against Moses Clifton was levied on property claimed by Mary Clifton, it was held that Moses Clifton was a competent witness on a trial of the right of property, and his competency is placed upon the ground that his interest was against the party calling him. The judgment debtor in that case, as in this, was called as a witness, by his vendee. And we are unable to perceive any distinction in the two cases. If the interest of the witness was against the party producing him in the one case, it most undoubtedly is, in the other. Again in the case of *Miller* v. *Dobson*, 1 Gilm. R. 572, which was an action of replevin, it was conceded by counsel, and acted upon by the court, as the settled common law rule, that in replevin by the claimant of property levied upon under execution, the judgment debtor is a competent witness. It is true, counsel conceded the rule in that case, but the court say they would not hesitate to exclude the witness under the statute if they could have done so, and they must have regarded the rule as inflexible, or they would have done so on common law grounds.

We have no hesitation in saying, that whether considered on principle or upon authority the witness was competent. If he has sold with a warranty, and a warranty of title is always implied in sales of chattels, and a trial results in favor of its liability to the execution, he thereby becomes liable to his vendee for a breach of warranty, for the price, whilst if the vendee recovers the property his liability to pay the execution, remains unimpaired. In either event his liability is the same, and his interest is balanced. We therefore see no error in permitting the witness to testify.

The bill of exceptions fails to state that it contains all of the evidence introduced on the trial in the court below, and we cannot inquire whether the verdict is supported by the evidence,

but it must be presumed that it is. The evidence that is contained in the bill of exceptions, tends to prove a delivery of possession by witness to plaintiff at the time of sale. Such being the case it was for the jury to determine whether the title and possession went together or not. It would have been error in the court when there was such evidence before the jury, to have instructed them, that the sale was fraudulent *per se.* Had there been an entire absence of all evidence of a change of possession accompanying the sale, then such an instruction would have been proper, but so long as there was evidence of that fact, however slight it might be, and however clearly it might have been rebutted, it was still a question for the jury and not for the court. The defendant's 13th instruction was, therefore, properly refused.

His 12th instruction is based upon the hypothesis that the vendee had no right to employ the vendor as a clerk to sell the goods, in connection with others. There is no doubt that it is a circumstance to be considered on the question of fraud, but undoubtedly may be explained, but it is not *per se* a fraud that admits of no explanation. If the vendor after the sale without a delivery of the goods, were to remain in the sole and exclusive possession, it would amount to a fraud in law, but such is not the evidence in this case. No evidence showed that R. H. Carlton was in the sole and exclusive possession, but it tended to show that he was only acting as a clerk, and that Telfer was the person having charge of the concern, and was the principal in its management. And for aught that appears the evidence may have been conclusive of that fact. This instruction without modification, so as to have left it to the jury to determine from the evidence whether he had remained in the exclusive possession and control of the goods, without ever having delivered them to the purchaser, was erroneous, and therefore properly refused.

There is no objection perceived to the modification made to defendant's first and second instructions. The various other instructions as asked and given presented the law fairly, as it arose on the facts of the case so far as we can determine from that contained in the bill of exceptions. We see no error in the record, and the judgment of the court below is affirmed.

*Judgment affirmed.*